**Krasaundra WARD, et al. Plaintiffs,**

v.

**Joyce THOMAS, in her capacity as Commissioner of the State of Connecticut Department of Social Services, Defendant.**

**No. CIV. 3:95CV1284 (JBA).**

United States District Court,
D. Connecticut.

March 31, 1998.

---

Shelley A. White, New Haven Legal Assistance, Kathleen A. Sullivan, Jerome N. Frank Legal Services Organization, Yale Law School, New Haven, for Plaintiffs.

Peter L. Brown, Attorney General's Office, Hugh Barber, Richard J. Lynch, Attorney General's Office, Health & Human Services, Hartford, CT, for Defendants.

### RULING ON PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT [docs. 83 and 88]

ARTERTON, District Judge.

Plaintiffs in this action initially alleged that defendant's proposed reduction in their monthly AFDC benefits effective August 1, 1995, involving the manner in which defendant intended to compute plaintiffs' AFDC benefits by attributing to them a portion of their housing subsidies as unearned income, violated federal law and the due process clause of the Fourteenth Amendment. Finding that plaintiffs had demonstrated both irreparable harm, and the likelihood of success on the merits of their claim that defendant's manner of reducing their benefits violates federal law, the Court granted pre-

liminary injunctive relief in *Ward v. Thomas*, 895 F.Supp. 406 (D.Conn.1995), familiarity with which is assumed.

The Personal Responsibility and Work Opportunity Act of 1006 ("PRA") eliminated AFDC's restrictions on defendant's ability to attribute income to welfare recipients when calculating their current monthly benefits from October 1996 onward.[1] Plaintiffs contend, however, that § 116(b)(2)(A) of the PRA[2] imposes a continuing obligation on defendant to correct prior underpayments of AFDC benefits pursuant to 42 U.S.C. § 602(a)(22), which obligation is expressly preserved by the "Savings Clause" of the PRA. In their Third Amended Complaint, plaintiffs' contend that the AFDC statute and regulations prohibit states from imputing income to the child's assistance unit based on resources available to others not legally responsible for that child and who is not a member of that child's assistance unit, and that by illegally attributing income to the plaintiff subclass and failing to correct those resulting underpayments, defendant is violating the AFDC, as perpetuated by the PRA, and thus § 1983. On September 26, 1997, the Court certified a class comprised of "all children who received Aid to Families with Dependent Children ("AFDC") benefits at any point between August 1, 1995 and October 1, 1996, while living in subsidized housing with a non-legally liable caretaker relative who was not a member of the child's assistance unit." Plaintiffs now seek summary judgment on this claim, a declaratory judgment and notice relief on behalf of the subclass.

Defendant, cross-moving for summary judgment on plaintiffs' claim, contends that plaintiffs have not demonstrated that the housing subsidy benefits belonged exclusively to the adult caretaker relatives, and that income may be attributed to a child receiving AFDC because the housing subsidy benefits all members of the household, including the child. Defendant also claims that even if plaintiffs establish a violation in the retroactive period, plaintiffs have not brought a timely request for an administrative fair hearing, and that the Eleventh Amendment bars declaratory and notice relief on plaintiffs' claims.

### PLAINTIFF'S IMPROPER ATTRIBUTION OF INCOME CLAIM

■ As noted above, plaintiffs' principal argument is that from August 1, 1995 to October 1, 1996, the Commissioner violated federal law by imputing income to the plaintiff subclass based on the value of housing subsidies received by a non-legally liable caretaker relatives with whom a plaintiff lived, but who were not members of that plaintiff's assistance unit. The AFDC statute provides that the income of certain other individuals can be properly attributed to a dependant child. Section 602(a)(31) of Title 42 of the United States Code provides that "... in making the determination for any month ..., the State agency shall take into consideration so much of the income of the dependent child's stepparent living in the same home as such child...." Section 602(a)(38) also provides that the State agency shall include the income of "any parent of such child," and any brother or sister of such child meeting certain conditions under the statute,[3] while § 602(a)(39) provides that the State agency may consider, with respect to a dependent child whose parent is under the age of 18, the income of such minor's own parents who are living in the same home as

---

1. The PRA replaced the AFDC program with the Temporary Assistance to Needy Families ("TANF") block grant program, and where defendant submitted a TANF plan effective October 1, 1996 (TANF was effective July 1, 1997 unless a state submitted a plan in advance of that time), the parties agree that from that day forward plaintiffs were no longer entitled to AFDC benefits.

2. Section 116(b)(2)(A) provides:

(2) CLAIMS, ACTIONS, . AND PROCEDURES.—The amendments made by this title shall not apply with respect to—
(A) powers, duties, functions, rights, claims, penalties, or obligations applicable to aid, assistance, or services provided before the effective date of this title under the provisions amended;...

3. *See* 42 U.S.C. §§ 606(a) and 607(a) regarding definition of "dependent child."

such minor and dependent child, i.e., the child's grandparents.

However, AFDC regulations clearly provide that states *may not* impute income to a child's assistance unit with regard to income available to other persons in the child's household who are not legally responsible for that child:

> ...the money amount of any need item included in the standard will not be prorated or otherwise reduced solely because of the presence in the household of a non-legally responsible individual; and the agency will not assume any contribution from such individual for the support of the assistance unit.... [4]

45 C.F.R. § 233.20(a)(2)(viii). *See Van Lare v. Hurley,* 421 U.S. 338, 347, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975) (invalidating state housing regulations requiring pro rata reduction in family shelter allowances solely because parent allows non-legally liable person to reside in home, and holding that "federal law and regulations as bar[ ] the States from assuming that non-legally responsible persons will apply their resources to aid the welfare child."); *Swift v. Blum,* 598 F.2d 312 (2d Cir.1979) (holding that State violated § 233.20(a)(2)(viii) by presuming contributions to household by non-legally liable persons from only the existence of their income).

Defendant maintains that under 42 U.S.C. § 602(a)(7)(C),[5] the housing subsidy obtained by a child's non-legally liable caretaker, who is not a member of his or her assistance unit, benefits all members of that household, including the child. Defendant relies on the fact that the United States Housing Act of 1937, 42 U.S.C. § 1437 was intended to benefit low income families, and cites *Johnson v. White,* 528 F.2d 1228, 1237 (2d Cir.1975) for the proposition that a child recipient benefits

from a non-legally liable caretaker relative's receipt of a housing subsidy, even where the caretaker is not part of the child's assistance unit. *Johnson,* however, addressed rental allowance budgeting for AFDC children residing with a non-legally liable relative who did not receive assistance, and held that it was reasonable to construe the allowance *not* as an attempt by the state to attribute income not available to the dependant children, but rather as an effort to ensure that relatives did not profit by charging outrageous rents to children who could not protect themselves. *Id.* at 1237. Significantly, *Johnson* was decided prior to the implementation of 45 C.F.R. § 233.20(a)(2)(viii). *See Swift,* 598 F.2d at 312 (*supra*).

In considering the housing subsidy as a "benefit" available to the assisted child, 45 C.F.R. § 233.20(a)(3)(ii)(D) provides guidance as to the availability of resources to recipients:

> To the extent not inconsistent with any other provision of this chapter, income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the ability to make such sum available for support and maintenance.

Indeed, the Supreme Court has approved this "actual availability principle," holding that "its purpose is to prevent the States from relying on imputed or unrealizable sources of income artificially to depreciate a recipient's need." *Heckler v. Turner,* 470 U.S. 184, 201, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985).

It is undisputed that the non-legally liable caretaker signs the lease for the housing chosen. As such, by paying the selected landlord a reduced amount of rent, it can be

---

4.  That section continues "... except as provided in paragraphs (a)(3)(xiv) and (a)(5) of this section and § 233.51 of this part." Those, however, do not appear to be relevant as they do not address income inclusion non-legally liable caretakers who are not part of a child's assistance unit. Section 233.51 addresses sponsored aliens, paragraph (a)(3)(xiv) addresses stepparents, and paragraph (a)(5) addresses a proration policy which is not at issue here.

5.  Section 602(a)(7)(C)(ii) provides that the State

(C) may, in the case of a family claiming or receiving aid under this part for any month, take into consideration as income ...
(ii) an amount not to exceed the value of any rent or housing subsidy provided to such family, to the extent such value duplicates the amount for housing included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income;

said the non-legally liable caretaker controls the housing subsidy. This is the situation to which the availability regulations are addressed, namely "the counting of income and resources controlled by persons outside the [assistance unit] for the purpose of determining the amount of assistance to be provided to the [assistance unit]." *Anderson v. Edwards*, 514 U.S. 143, 154, 115 S.Ct. 1291, 131 L.Ed.2d 178 (1995).[6] Further, the child recipient has no legal interest in the housing subsidy itself because the child's access to the subsidy terminates when his or her relationship with the non-legally liable caretaker, who receives the subsidy, terminates. *See* 24 C.F.R. § 982.315(a) (housing authorities may deny subsidized housing to any family member after dissolution of the family unit).

Although defendant contends that § 233.20(a)(3)(ii)(D) is inapplicable to the plaintiff class because § 42 U.S.C. § 602(a)(7)(A) provides that the State may consider the "income and resources of any child or relative claiming aid to families with dependent children" without qualification of that income as "available," § 602(a)(7)(A) provides that the other income and resources to be taken into account in determining the child's assistance level are that of any relative claiming AFDC or of any other individual whose needs the State determines should be considered in determining the child's need. Here, the non-legally liable caretaker relatives are *not* AFDC recipients, nor may the state assume any contribution from non-legally liable caretakers for the child's support under § 233.20(a)(2)(viii). Thus, it cannot be said that the language of § 607(a)(7)(A) vitiates the availability regulations which are addressed to the very problem at issue here—the counting of income and resources controlled by persons outside the assistance unit (non-legally liable caretakers not in the child's assistance unit) in determining the amount of assistance to be provided to that unit. *See Anderson*, 514 U.S. at 154, 115 S.Ct. 1291. Defendant also contends that § 602(a)(7)(C)(ii), which addresses the valuation of housing subsidies under the AFDC program, "must prevail" over the "more general" availability regulation, which would apply to other types of countable income. However, because § 602(a)(7)(C) applies to consideration of the income of *families* claiming or receiving AFDC, and addresses the value of housing subsidies provided to those families, this argument is unpersuasive since the plaintiff subclass consists not of families receiving AFDC, but of individual children receiving AFDC who live with non-legally liable caretakers who are not part of the children's assistance unit.

In view of the statutes, regulations and case law, it is hard to discern how the laudable purpose of providing public housing to low-income individuals, translates to a quantifiable benefit to a child receiving assistance, when only the non-legally liable caretaker, and not the child or other household member, is the recipient of the public housing subsidy. Rather, the subsidy to the non-legally liable caretaker can be considered to be an income resource which, under federal law, the State is prohibited from attributing to a child's assistance unit. For the foregoing reasons, the Court concludes that attribution of the public housing subsidies of non-legally liable caretakers of plaintiffs, who are not members of their assistance units, is improper under the AFDC statute and implementing regulations.

## STATUTE OF LIMITATIONS

The Commissioner also contends that, even if the members of the plaintiff sub-class have been underpaid AFDC benefits because the housing subsidies of their non-legally liable caretakers were improperly attributed to them, the Department is under no obligation to correct the underpayments because plaintiffs failed to file administrative appeals re-

6. In *Anderson,* the Court noted that the availability regulations, such as 45 C.F.R. § 233.20(a)(3)(ii)(D), were adopted to implement the Court's decisions in *Van Lare* and *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) and *Lewis v. Martin*, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970), in which the State had impermissibly counted as available to the assistance unit income that was not actually or legally available because it was controlled by a person who was not a member of the assistance unit and who was not applying for, or receiving, AFDC assistance. 514 U.S. at 154, 115 S.Ct. 1291.

garding the reduction in their benefits within sixty days of the reductions, citing *Withey v. Perales,* 920 F.2d 156 (2d Cir.1990). In *Withey,* AFDC recipients brought a § 1983 action challenging a New York law imposing a 60–day limitation period for appealing claims for AFDC underpayments under § 602(a)(22), arguing that the state law violated § 602(a)(22), which requires states to "promptly take all necessary steps to correct any overpayment or underpayment of aid." *Id.* at 157. After consideration of the text of the statute, its legislative history and case law, the Second Circuit concluded that the statute did not preclude a limitations period for appealing denials of AFDC underpayment claims, and that New York's 60–day limitation was reasonable. *Id.* at 158–59. From this conclusion, defendant argues that Connecticut's similar 60–day appeal provision, Conn. Gen.Stat. § 17b–60, operates to bar the plaintiff subclass' claim for AFDC underpayments.[7]

■ Although *Withey* was a § 1983 action, those plaintiffs were challenging the validity of the 60–day state statute of limitations which barred their state administrative appeal, rather than challenging the merits of their claimed AFDC underpayments. The plaintiff subclass here seeks a declaratory judgment on the *merits* of their underpayment claim, namely, that the Department impermissibly attributed the housing subsidies received by the non-legally liable caretakers of class members, who were not members of their assistance units. This action is not an administrative appeal. Nor is the plaintiff sub-class required to exhaust its administrative remedies in order to bring its § 1983 claim. *Patsy v. Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Thus, the relevant statute of limitation on plaintiffs' § 1983 claim is three years, the statute of limitations for § 1983 actions brought in Connecticut. *Lounsbury v. Jeffries,* 25 F.3d 131, 134 (2d Cir.1994). Where the plaintiff subclass members ceased receipt of AFDC benefits October, 1996, named plaintiff Avery Fitzpatrick's intervention on September 23, 1996, and the sub-

class's certification on September 29, 1997, is timely.

## RELIEF

Plaintiffs seek a declaratory judgment that defendant improperly attributed income to the plaintiff subclass, namely the subsidized housing benefits of their non-legally liable caretakers, who were not members of their assistance units, and that by failing to correct those resulting underpayments, the Department is violating the AFDC, as perpetuated by the PRA, and thus § 1983. Plaintiffs also seek notice relief on behalf of the subclass under *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The Commissioner, however, contends that the relief sought by plaintiffs is barred by the Eleventh Amendment because plaintiffs fail to demonstrate an ongoing violation of federal law.

In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court held that a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment. The *Edelman* decision, however, also pointed out that under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury. Thus, "[t]he distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other." *Quern,* 440 U.S. at 337, 99 S.Ct. 1139. At issue in *Quern* was the propriety of "notice relief," which simply apprised plaintiff class members of the existence of whatever administrative procedures may already be available under state law by which they may receive a determination of eligibility for past benefits,

---

7. Intervenor Avery Fitzpatrick received an adverse determination on his claim for underpayments in August, 1995, and in any event the

AFDC program terminated effective October, 1996. Defendant contends 60–days from either date has lapsed.

and the mere sending of which did not trigger the state administrative machinery, i.e. whether a recipient of notice decides to take advantage of those available state procedures is left completely to the discretion of that particular class member—whether or not the class member will receive retroactive benefits rests entirely with the State, its agencies, courts and legislature, not with the federal court. *Id.* at 348, 99 S.Ct. 1139. Further, the notice simply informed class members that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures which they may wish to pursue. *Id.* at 349, 99 S.Ct. 1139. Thus, the class members were given no more than what they would have gathered by sitting in the courtroom. *Id.*

*Quern* held, however, that this notice relief was "properly viewed as *ancillary* to the prospective relief already ordered by the court." *Id.* This requirement was further discussed in *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), which is similar to the instant case and quite instructive. In *Green,* petitioners brought two separate class actions in federal court against the Director of the Michigan Department of Social Services, claiming that the calculation of benefits under the AFDC program violated certain provisions of that law. Specifically, the two class actions alleged that certain of defendants' policies and regulations violated § 1983 by inflating their respective class members' earned income and thereby causing a reduction or termination of AFDC benefits contrary to the applicable federal law (prohibiting deduction of child care costs in calculation of earned income; automatic inclusion of stepparents' income in earned income calculation). Before a final determination on the merits of either case could be made, Congress amended the relevant statutory provisions, and it was undisputed that defendant's calculations thereafter conformed to federal law. There was no claim that respondent's current deduction policies violated federal law, or that any ongoing violation existed. Nevertheless, plaintiffs claimed they were entitled to both *Quern* "notice relief" and a declaration that defendants' prior conduct violated federal law. The district

court denied both forms of relief and was affirmed by the Sixth Circuit. The Supreme Court affirmed. *Id.* at 65–66, 106 S.Ct. 423. The Supreme Court framed the issue before it as whether federal courts may order the giving of *Quern* notice, or the issuance of a declaratory judgment that state officials violated federal law in the past, when there is no ongoing violation of federal law. *Id.* at 67, 106 S.Ct. 423.

■ Although plaintiffs conceded that any claim they might have had for the specific type of injunctive relief approved in *Ex Parte Young* was rendered moot by the AFDC amendments, they nevertheless sought *Quern* notice relief, contending that it is an independent form of prospective relief protected against the Eleventh Amendment bar by *Ex parte Young*. The Supreme Court disagreed:

> Our review of the long, drawn-out Jordan litigation convinces us that neither the Court of Appeals nor this Court conceived of the requested notice allowed in that case to be an independent form of relief. We simply held that the specific order fell within the Ex Parte Young exception to the Eleventh Amendment principle of sovereign immunity because it was ancillary to a valid injunction previously granted and was sufficiently narrow to retain its character as a mere case-management device... Because 'notice relief' is not the type of remedy designed to prevent ongoing violations of federal law, the Eleventh Amendment limitation on the Art. III power of federal courts prevents them from ordering it as an independent form of relief.

*Id.* at 72, 106 S.Ct. 423. Thus, notice relief can only be granted as ancillary to other prospective relief remedying an ongoing violation of federal law.

The Supreme Court also addressed the propriety of declaratory relief in this context. The *Green* plaintiffs argued that they were entitled to a declaratory judgment that defendant violated federal law in the past. Noting that a declaratory judgment was not available in a number of instances, the Supreme Court concluded that issuance of a

declaratory judgment in that case was improper where there was no claimed continuing violation of federal law, and therefore no occasion to issue an injunction and no threat of state officials violating the repealed law in the future. The Supreme Court reasoned:

[w]e think that the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed. But the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment.... [A] declaratory judgment is not available when the result would be a partial "end run" around our decision in Edelman v. Jordan [citation omitted].

*Id.* at 73, 106 S.Ct. 423. In sum, the Supreme Court held that a declaratory judgment is not available to ascertain past lawfulness or unlawfulness under federal law, but only to determine parties' rights as to ongoing violations of federal law.

■ Here, plaintiffs seek a declaratory judgment and ancillary *Quern* notice relief.[8] Although the situation of these plaintiffs appears similar to *Green,* in which the Supreme Court found that declaratory relief was unavailable, plaintiffs here contend that defendant is engaging in an ongoing violation of federal law which makes this case different from *Green,* and thus declaratory and *Quern* notice relief should be afforded. Specifically, plaintiffs assert that defendant's ongoing failure to correct the AFDC underpayments is an ongoing violation of federal law because of the "Savings Clause" in the Personal Responsibility and Work Opportunity Act ("PRA").

Prior to amendment of the AFDC statute and regulations, a state's failure to correct underpayments violated federal law. *See* 42 U.S.C. § 602(a)(22) (1996) (state AFDC plan

must provide that the state agency will promptly take all necessary steps to correct any underpayments of aid). Although they concede that as of October 1, 1996 the AFDC program's income attribution and underpayment correction requirements no longer apply to future welfare payments made by defendant, plaintiffs contend that the PRE imposes a continuing duty on defendant to correct underpayment made previously to the plaintiff subclass under the AFDC program. Plaintiffs refer to § 116(b)(2)(A) of the PRA which provides:

(2) CLAIMS, ACTIONS, AND PROCEDURES.—The amendments made by this title shall not apply with respect to—

(A) powers, duties, functions, rights, claims, penalties, or obligations applicable to aid, assistance, or services provided before the effective date of this title under the provisions amended;

Thus, plaintiffs maintain that states remain under a continuing obligation to correct underpayments made under the AFDC program, and defendants' failure to comply with its affirmative duty to correct underpayments to the plaintiffs represents a continuing violation of federal law. Plaintiffs contend that a declaratory judgment would adjudicate the obligations and rights of the parties, *see Continental Casualty Co. v. Coastal Savings Bank,* 977 F.2d 734, 737 (2d Cir.1992), and that notice relief would simply inform the plaintiff subclass that the federal suit has ended and that certain state remedies may be available. As discussed above, plaintiffs claim that such declaratory and notice relief is consistent with *Green* because in that case the defendant was under no continuing federal obligation to correct the underpayments as is defendant here by virtue of PRA's savings clause. Thus, plaintiffs posit that unlike in *Green,* defendants' failure to correct underpayments is an ongoing violation of federal law for which a declaratory judgment and *Quern* notice relief are appropriate remedies.

Plaintiffs contend that *Moore v. Miller,* 612 F.Supp. 952 (N.D.Ill.1985) is directly on

---

8. Plaintiffs concede that prospective injunctive relief is not available. (Pls.' Mem. at 15).

point. In *Miller*, plaintiffs challenged the calculation of AFDC benefits and sought notice relief even though the district court's injunction regarding the state's handling of benefit payments had been rendered a nullity by a change in federal law. Plaintiffs also sought a declaration that between October 1, 1981 and October 1, 1984 defendants were required to calculate payments in accordance with standards set out in the court's injunction. The district court granted the declaratory judgment for the purpose of ensuring proper adjudication of requests for reimbursement filed through state administrative procedures, and that any administrative determination of past underpayments would be adjudicated in conformity with the district court's earlier findings. However, this was exactly the reasoning rejected in *Green*. When *Miller* was decided in June of 1985, the Sixth's Circuit's decision in *Green* was on *cert.* to the Supreme Court. In fact, the *Miller* court indicated that it disagreed with the conclusion of the Sixth Circuit. In view of *Green*, decided in December of 1985, *Miller* is no longer good law on this issue.

The Commissioner argues that *Green* prohibits declaratory judgment and ancillary notice relief for plaintiffs, and cites *Marbley v. Bane*, 57 F.3d 224 (2d Cir.1995) in support of her position. In *Marbley*, representatives of a class of New Yorkers living in federally subsidized housing sought an allotment from funds block-granted by the federal government to the state in order to subsidize heating costs of low-income individuals. They alleged that the Commissioner of New York State Department of Social Services and county social services violated the Low–Income Home Energy Assistance Act (LIHEEA) in administering New York's Home Energy Assistance Program (HEAP). After a change in LIHEEA, defendants rescinded the allegedly violative policy in 1993. Thus, the only live claim of the group of plaintiffs whose subsidies were reduced because they lived in government housing, but paid separately for their heat, was with respect to the subsidy reduction for HEAP plan year 1992–93. *Id.* at 232. Although the district court originally decided that declaratory relief was appropriate with respect to the 1992–93 plan year, the district court withdrew that ruling on reconsideration and relying on *Green*, held that because any violation of plaintiffs' rights under LIHEEA had been corrected when the state rescinded the policy, the Eleventh Amendment barred a declaratory judgment for past action. *Id.*

The Second Circuit agreed:

> Green is directly on point. After dismissal of Beauregard's claims for prospective relief as moot, there was nothing left of her case but a claim for retrospective declaratory judgment and an injunction. Green forbids such a declaration, and there is therefore no reason to entertain Beauregard's claim for injunctive relief.

*Id.* However, *Marbley* is not dispositive because in that case there was no claim of an ongoing violation of federal law warranting prospective relief, as there is here.[9]

Defendant, however, claims that plaintiffs' contention that the PRA establishes an ongoing violation of federal law must fail because in order to enforce a § 1983 action in this context, the terms of the federal-state cooperative grant program creating the purported federal statutory right violated under § 1983 must be clearly stated as a condition of the state's receipt of federal assistance under the program, citing *Pennhurst State School v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Defendant maintains that no such obligation is imposed by the PRA.

In *Pennhurst*, retarded residents of a Pennsylvania hospital for the care and treatment of the mentally retarded brought suit

---

**9.** Defendant also cites *Reed v. Health and Human Services*, 774 F.2d 1270, (4th Cir.1985), *rev'd on other grounds, sub nom,. Lukhard v. Reed*, 481 U.S. 368, 107 S.Ct. 1807, 95 L.Ed.2d 328 (1987). In *Reed*, plaintiffs sought an injunction mandating that the state pay AFDC benefits which had been wrongfully denied plaintiffs in the past. Although the Fourth Circuit disagreed with plaintiff that the continuing obligation to correct underpayments under § 602(a)(22) enabled the court to grant the injunction, it reached this conclusion because the retroactive benefits could not be seen as an adjunct of the court ordered prospective relief, but could only constitute redress for past violations of federal law, and would thus be indistinguishable from past damages, barred by *Edelman*. Here, plaintiff's claim is for declaratory and notice relief.

challenging conditions of confinement. The Supreme Court framed the question as whether Congress intended to create enforceable obligations on the state in the Developmentally Disabled Assistance and Bill of Rights Act which provided funds to the state in accordance with a state plan submitted to USHHS. The Supreme Court noted that Congress may fix the terms on which it shall disburse federal money to the states, and that legislation enacted pursuant to the spending power is much in the nature of a contract, in return for federal funds, the states agree to comply with federally imposed conditions. *Id.* at 17, 101 S.Ct. 1531. The Supreme Court further noted that the legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the contract, and thus if Congress intends to impose a condition on the grant of federal money, it must do so unambiguously. *Id.* "By insisting that Congress speak with a clear voice, we enable the States. to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.*

Plaintiffs contend that defendant misstates their argument—they do not assert that the savings clause of the PRA imposed an obligation to correct AFDC underpayments as *a condition of receiving TANF funds,* which may implicate *Pennhurst* concerns. Rather, plaintiffs contend that the obligation to correct underpayments is imposed by the former AFDC statute and is merely continued by the PRA, i.e. this obligation was accepted by Connecticut as a condition of its receipt of funds under the old AFDC program, and that the PRA assures that the obligation continues even after termination of AFDC. Plaintiffs cite *Bennett v. New Jersey,* 470 U.S. 632, 641, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985) for the proposition that even if federal provisions of the grant program change, the state's obligations and liabilities arising under earlier grants do not expire. In *Bennett,* the state challenged the Secretary of Education's decision that the state must refund $1,031,304 granted by the federal government under Title 1 of the Elementary and Secondary Education Act. The Supreme Court held that the substantive provision of

the 1978 amendments to Title 1 of the Act did not apply retroactively to determine if those funds were misused from 1970–72, and that changes in the substantive standards of the grant program did not alter obligations and liabilities arising under earlier grants. The Court "conclude[d] that absent a clear indication to the contrary in the relevant statutes or legislative history, changes in the substantive standards governing federal grant programs do not alter obligations and liabilities arising under earlier grants." *Id.* at 641, 105 S.Ct. 1555. As plaintiffs correctly observe, the savings clause of the PRA indicates that Congress did intend that Connecticut's obligations incurred by receipt of AFDC grants remain in force, and defendant has presented no evidence of Congressional intent to relieve those obligations.

Defendant notes that the effective date for the implementation of AFDC's replacement, Temporary Assistance to Needy Families ("TANF") is July 1, 1997, however a state may submit a TANF plan in advance of that date at which time the TANF provisions become effective and the AFDC provisions no longer apply. Thus, defendant claims that because she submitted a TANF plan effective October 1, 1996, the AFDC underpayments obligation terminated on October 1, 1996. Defendant also argues that subsection (c) of § 116 of the PRA provides that no individual or family shall be entitled to any AFDC benefits or services under any approved state plan after October 1, 1996. Thus, defendant argues that the state's duty to correct underpayments also terminated on October 1, 1996 and no continuing obligation to correct such underpayments can exist. Further, defendant argues that the savings clause language in § 116(b)(2)(A) provides only that the federal AFDC rules continue to apply to claims for assistance prior to the effective date of TANF (when the AFDC program was in effect in the state), it does not impose a continuing obligation for participating states to correct any past AFDC overpayments as a condition of TANF participation, i.e. the AFDC rules continue to apply to the adjudication of claims for assistance applicable to the prior period. Defendant argues from this that no obligation is im-

posed by the PRA requiring correction of past underpayments, and thus the savings clause does not provide any basis for a continuing violation for which the Court can grant declaratory relief.

These arguments, however, do not appear to refute the fact that the savings clause expressly provides that the amendments *shall not apply* to obligations arising under the AFDC program before the effective date of the PRA. The PRA provides for the post-amendment survival of powers, duties, functions, rights, claims, penalties, or obligations applicable to aid, assistance or services provided before the effective date of the amendment under the provisions amended. Defendant overlooks the fact that the savings clause expressly retains *duties* and *obligations* incumbent upon a state under the AFDC program which existed prior to the effective date of the amendment, as well as prior claims, such as plaintiffs' underpayment claims.. Although the amendments provide no further entitlement to AFDC benefits as of October 1, 1996, the savings clause ensures that obligations and duties incurred by the state prior to amendment are not extinguished. Thus, the savings clause retains the state's duty to correct AFDC underpayments made prior to October 1, 1996.

Defendant further argues that in *Green*, the Supreme Court noted the fact that the AFDC act had already been amended to require participating states to correct any underpayment, and that despite noting plaintiff's reliance of that underpayment correction requirement as imposing an ongoing federal duty, the Supreme Court found the Eleventh Amendment bar to be applicable to declaratory relief absent a finding that the state's current polices and practices constituted an ongoing violation of the current requirements of federal law. In short, defendant reads *Green* as finding that an existing federal statutory mandate to correct past violations was insufficient to overcome the Eleventh Amendment bar. Defendant misstates *Green*. *Green* expressly found that the plaintiffs made no allegation of any ongoing, continuing violation of federal law. *See* 474 U.S. at 66, 73–74, 106 S.Ct. 423. Rather, defendant is citing to Justice Marshall's dis-

sent (which is at odds with the *Green* plaintiffs allegations outlined by the majority). *See* 474 U.S. at 80, 106 S.Ct. 423 n. * (Marshall, J. dissenting). The opinion of the Court does not address the obligation to correct underpayments.

In view of foregoing, the Court concludes that the PRE's savings clause, providing for the post-amendment survival of powers, duties, functions, rights, claims, penalties, or obligations applicable to AFDC aid, assistance or services provided before the effective date of the amendment, does not extinguish the state's duty to correct underpayments made prior to the PRE's effective date, here October 1, 1996. Since defendant refuses to correct the pre-October 1, 1996 underpayments made to the plaintiff subclass—which, as the Court concluded, resulted from the Department's improper attribution of public housing subsidies received by their non-legally liable caretakers who are not part of their assistance units—defendant is continuing to violate federal law by failing to do so. Thus, the Court concludes that the plaintiff subclass is entitled to declaratory and notice relief consistent with *Green*.

Accordingly, the plaintiffs' Motion for Partial Summary Judgment [doc. 83] is GRANTED, and defendant's Cross–Motion for Partial Summary Judgment [doc. 88] is DENIED. Plaintiffs are directed to file a proposed form of notice relief within 30 days of the date of this ruling.

IT IS SO ORDERED.