207 F.3d 114 (2nd Cir. 2000)
 KRASAUNDRA WARD, AKILAH BITTLE, DENISE MILLER, YECENIA RIVERA, PHILOMENA COLLINS, Individually and on behalf of all others similarly situated, Plaintiffs-Appellees,
v.
ANNE C. CLARK, JENNIFER SHERARD, and AVERY FITZPATRICK, Intervenors-Plaintiffs-Appellees,
v.
JOYCE THOMAS, Commissioner, Connecticut Department of Social Services, Defendant-Appellant,
UNITED STATES DEPARTMENT OF HEALTH and HUMAN SERVICES, Third-Party-Defendant.
 No.1414, Docket No. 98-6193
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 12, 1999
Decided: March 24, 2000
 
 Appeal from a final order of the United States District Court for the District of Connecticut (Janet Bond Arterton, J.) granting summary judgment in favor of intervenors-plaintiffs in their 1983 class action for declaratory and injunctive relief.
 
 
 1
 Reversed on the ground that the Eleventh Amendment bars the action.
 
 
 2
 Judge Straub dissents in a separate opinion.
 
 
 3
 HUGH BARBER, Assistant Attorney General for the State of Connecticut (Richard Blumenthal, Attorney General for the State of Connecticut, Richard J. Lynch, Patricia McCooey, Assistant Attorneys General, on the brief), for Defendant-Appellant.
 
 
 4
 KATHLEEN KELLER, New Haven, CT (Kathleen A. Sullivan, Ian Carleton, The Jerome N. Frank Legal Services Organization, Shelley White, New Haven Legal Assistance Association, on the brief), for Intervenors-Plaintiffs-Appellees.
 
 
 5
 Before: VAN GRAAFEILAND, JACOBS and STRAUB, Circuit Judges.
 
 
 6
 Judge STRAUB dissents in a separate opinion.
 
 JACOBS, Circuit Judge:
 
 7
 In 1995, Connecticut General Statute 17b-104 was amended to reduce benefits payable under the former Aid to Families with Dependent Children ("AFDC") program for those beneficiaries who also received housing subsidies. See 1995 Conn. Acts 95-351, 2(d) (Reg. Sess.) (codified at Conn. Gen. Stat. 17b-104 (1996)). The amendment was challenged under 42 U.S.C. 1983 by a class of AFDC beneficiaries seeking declaratory and injunctive relief against defendant-appellant Joyce Thomas, Commissioner of the Connecticut Department of Social Services ("Commissioner"). The claims of the original class of plaintiffs have been resolved. The present appeal concerns the claims asserted by intervenor Avery Fitzpatrick, a minor child whose benefits were reduced under the amendment because he lived with an adult caretaker who received a housing subsidy. He challenges the reduction on the ground that he was not a beneficiary of the subsidy because the caretaker owed him no legal duty of support. The district court certified a subclass of all children similarly situated (the "Fitzpatrick subclass").
 
 
 8
 The Commissioner now appeals from a final order of the United States District Court for the District of Connecticut (Janet Bond Arterton, J.), granting summary judgment in favor of the Fitzpatrick subclass. See Ward v. Thomas, 9 F. Supp. 2d 109 (D. Conn. 1998). The Commissioner contends that the district court erred because: (1) under the Eleventh Amendment, pursuit of these claims in federal court is barred by state sovereign immunity, (2) the challenged state policy is consistent with federal law, and (3) the claims are barred because appellees failed to pursue their state administrative remedies in a timely fashion.
 
 
 9
 We hold that the Eleventh Amendment bars the Fitzpatrick subclass's action, and reach no other issue.
 
 BACKGROUND
 
 10
 This appeal arises from the administration of the now-terminated AFDC program by the State of Connecticut. The program was intended to encourage "the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services ... to needy dependent children and the parents or relatives with whom they are living." 42 U.S.C. 601 (1994). States were not required to participate in the AFDC program, but those that did received federal matching funds and partial reimbursement of expenses. See Mont v. Heintz, 849 F.2d 704, 706 (2d Cir. 1988). Participating states were required in turn to submit an AFDC plan meeting the requirements of 42 U.S.C. 602 for the approval of the Secretary of the Department of Health and Human Services and to "administer their plans in conformity with applicable federal law." Id. (citing Rosado v. Wyman, 397 U.S. 397, 408 (1970)).
 
 
 11
 Broadly speaking, the AFDC entitlement was a function of two factors established by each participating state: (1) the standard of need, and (2) the level of benefits. See id. (citing 45 C.F.R. 233.20(a)(2)). The standard of need was "a dollar figure set by each State reflecting the amount deemed necessary to provide for essential needs, such as food, clothing, and shelter." Quern v. Mandley, 436 U.S. 725, 737 (1978). The level of benefits determined the amount of assistance that was provided and was "not necessarily a function of the standard of need." Id. "On both scores Congress has always left to the States a great deal of discretion." Rosado v. Wyman, 397 U.S. 397, 408 (1970).
 
 
 12
 By legislation enacted in 1995, Connecticut reduced the level of AFDC benefits provided to families living in subsidized housing, by an amount equal to eight percent of the state's standard of need. See Ward v. Thomas, 895 F. Supp. 406, 410 (D. Conn. 1995). This amount was intended to account for the financial benefit attributable to the housing subsidy. See Conn. Gen. Stat. 17b-104(d) (1996).[1]
 
 
 13
 In June 1995, the original class of plaintiffs filed suit challenging this planned reduction in AFDC benefits. See Ward, 895 F. Supp. at 408, 410. The original complaint, later amended, alleged that the planned reduction was enacted without timely and adequate notice and in violation of federal statutory and constitutional provisions. See id. at 408. The class sought to enjoin the Commissioner from carrying out the planned reduction policy.
 
 
 14
 In March 1996, Avery Fitzpatrick, a minor acting through his caretaker and great-aunt, Annie Dykes, intervened and filed a complaint of his own. Although Dykes had no legal responsibility to care for Fitzpatrick, she cared for him in her federally-subsidized apartment. Fitzpatrick was an AFDC recipient; Dykes was not. After the effective date of the 1995 amendment, the Commissioner reduced Fitzpatrick's monthly AFDC benefits from $356 to $300 based on his residence in subsidized housing. Fitzpatrick alleged that the benefits reduction ran afoul of a federal regulation prohibiting the Commissioner from assuming that an AFDC recipient receives support from any person who lives in the household but has no legal responsibility to furnish support.
 
 
 15
 The AFDC program was terminated effective October 1, 1996, by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), which replaced AFDC with a program called Temporary Assistance to Needy Families ("TANF"). See 42 U.S.C. 601 et seq.; see also Ward, 9 F. Supp. 2d at 111 n.1. PRWORA contains a provision, 116(b)(2)(A), 110 Stat. at 2184, called "the Savings Clause" by the parties, which, according to Fitzpatrick (and the original plaintiffs), preserved the validity of AFDC statutes and regulations with respect to their claims. Thus, after the effective date of PRWORA, the original plaintiffs filed a Third Amended Complaint, which restated the essence of the initial Amended Complaint, with the addition of Fitzpatrick's claim, and sought correction of past underpayments pursuant to the requirements of the former AFDC program as preserved by the Savings Clause.
 
 
 16
 In September 1997, the district court certified a plaintiff subclass of "all children who received [AFDC] benefits at any point between August 1, 1995 and October 1, 1996, while living in subsidized housing with a non-legally liable caretaker relative who was not a member of the child's assistance unit." Ward, 9 F. Supp. 2d at 111. With the exception of the claim pressed by the Fitzpatrick subclass, all claims were eventually resolved and are not the subject of this appeal.
 
 
 17
 The Fitzpatrick subclass and the Commissioner cross-moved for partial summary judgment. On March 31, 1998, the district court denied the Commissioner's motion and granted summary judgment in favor of the subclass.
 
 
 18
 The district court read PRWORA's Savings Clause to preserve the requirements of the AFDC program with respect to the subclass's claim, see id. at 119, and concluded that under those requirements, the Commissioner could not impute to the Fitzpatrick subclass the housing subsidies received by the children's non-legally responsible caretakers, see id. at 111-13. The district court based its holding in part on 45 C.F.R. 233.20(a)(2)(viii), an AFDC regulation which prohibited the Commissioner from assuming that a non-legally responsible adult who shares a household with an AFDC child recipient contributes to the support of the child. See Ward, 9 F. Supp. 2d at 112 (citing Van Lare v. Hurley, 421 U.S. 338, 347 (1975)). The district court gave consideration to 42 U.S.C. 602(a)(7)(C), which allowed an offset of AFDC benefits to the extent that the AFDC benefits duplicated the value of the housing subsidy, but concluded that this subsection was inapplicable because the Fitzpatrick subclass children did not themselves receive the housing subsidies. See Ward, 9 F. Supp. 2d at 112-13. In addition, the district court concluded that the housing subsidies were not otherwise available to the subclass members as defined by 45 C.F.R. 233.20(a)(3)(ii)(D). See Ward, 9 F. Supp. 2d at 112-13 (citing Anderson v. Edwards, 514 U.S. 143, 154 (1995)). Thus, with respect to the legality of the Commissioner's policy, the district court held that:
 
 
 19
 [i]n view of the statutes, regulations and case law, it is hard to discern how the laudable purpose of providing public housing to low-income individuals[] translates to a quantifiable benefit to a child receiving assistance, when only the non-legally liable caretaker, and not the child or other household member, is the recipient of the public housing subsidy. Rather, the subsidy to the non-legally liable caretaker can be considered to be an income resource which, under federal law, the State is prohibited from attributing to a child's assistance unit.
 
 
 20
 Id. at 113.
 
 
 21
 As to the timely exhaustion of administrative remedies, the court concluded that the subclass was not required to appeal the Commissioner's action to a state administrative forum within the 60 days required under Connecticut law because the suit challenged the Commissioner's policy on its face rather than as applied. See id. at 113-14. The district court also noted that there was no administrative exhaustion requirement under 1983; therefore, the subclass's action was properly filed within the three-year statute of limitations period for 1983 suits in Connecticut. See id. at 114 (citing Patsy v. Board of Regents, 457 U.S. 496, 516 (1982)).
 
 
 22
 Finally, the district court concluded that the Eleventh Amendment did not bar the Fitzpatrick subclass's action. See id. at 114-19. The court acknowledged that states are immune from private actions seeking damages for past injuries, but concluded that by virtue of PRWORA's Savings Clause, which preserved duties existing prior to the effective date of the statute, the Commissioner was engaged in an ongoing violation of federal law that was amenable to relief under the Supreme Court's decision in Ex parte Young, 209 U.S. 123 (1908). See Ward, 9 F. Supp. 2d at 116-19.
 
 
 23
 By way of relief, the district court (i) declared that the Commissioner had violated federal law by reducing AFDC benefits to the subclass, and (ii) directed that notice be sent to the subclass children and their caretakers, pursuant to Quern v. Jordan, 440 U.S. 332 (1979), informing them of the declaration and referring them to a state forum for a ruling as to whether they were entitled to further relief.[2] See Ward, 9 F. Supp. 2d at 116, 119.
 
 DISCUSSION
 
 24
 We review a grant of summary judgment de novo. See Bogan v. Hodgkins, 166 F.3d 509, 511 (2d Cir. 1999). Although we view facts in the light most favorable to the non-moving party, see Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir. 1999), no material facts are in dispute for the purpose of this appeal.
 
 
 25
 * This case is controlled by Green v. Mansour, 474 U.S. 64 (1985), in which AFDC recipients challenged Michigan's calculation of benefits as violative of federal law. Before the merits of the recipients' claims were decided, Congress amended the law (and Michigan's policies were conformed) in such a way that the plaintiffs had no remaining claim based on the calculation of present or future benefits. The plaintiffs were left with a claim for a declaration that the state's past conduct violated federal law and a claim for "notice relief." In these salient respects, the circumstances in Green mirror the facts presented on this appeal.
 
 
 26
 The Supreme Court held that the Green plaintiffs' claims were barred by the Eleventh Amendment. On this appeal, we come to the same conclusion.
 
 
 27
 Green begins with Ex Parte Young, which "held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." Green, 474 U.S. at 68 (citing Ex Parte Young, 209 U.S. 123, 155-56, 159 (1908)). At the same time, Green emphasizes that the Supreme Court has declined to extend the reasoning of Ex Parte Young to claims for retrospective relief. See id. (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-03 (1984); Quern v. Jordan, 440 U.S. 332, 337 (1979); Edelman v. Jordan, 415 U.S. 651, 668 (1974)). The line between prospective and retrospective relief is drawn because "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law," whereas "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." Id. Accordingly, suits against states and their officials seeking damages for past injuries are firmly foreclosed by the Eleventh Amendment. See Edelman v. Jordan, 415 U.S. 651, 663 (1974); Hans v. Louisiana, 134 U.S. 1, 10, 15 (1890).
 
 
 28
 The class in Green, like the Fitzpatrick subclass, endeavored to blur the distinction between prospective and retrospective relief by seeking both a declaratory judgment that the state had violated federal law in the past and "notice relief" like that provided in Quern. At the risk of being obvious, a party armed with such relief from the federal court and the doctrine of res judicata would have little left to do but appear in state court, and employ the state court as "a form of accounting proceeding" for a retrospective (federal) award of damages against the state. Green, 474 U.S. at 73.
 
 
 29
 The Green Court held that the Eleventh Amendment barred the federal courts from issuing declaratory relief or notice relief because, though the recipients framed their prayer for relief in prospective terms, the effect of what they sought would be entirely retrospective because the state was no longer violating federal law. See id. at 71-73. We conclude that the Fitzpatrick subclass's claims are barred by the Eleventh Amendment for the same reasons stated in Green.
 
 
 30
 Declaratory Relief. The declaratory judgment sought by the Fitzpatrick subclass is unavailable in federal court because there is no "claimed continuing violation of federal law" or "threat of state officials violating the repealed law in the future." Id. at 73. Any declaration could say no more than that Connecticut had violated federal law in the past.
 
 
 31
 As Green emphasized, the Declaratory Judgment Act of 1934 "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Id. at 72 (quoting Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 241 (1952)) (internal quotation marks omitted). "The propriety of issuing a declaratory judgment may depend upon equitable considerations, and is also informed by the teachings and experience concerning the functions and extent of federal judicial power." Id. (citations and internal quotation marks omitted). Of course, a declaration that Connecticut's AFDC policy violated federal law would have its use if it was "offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed." Id. at 73. But such a declaration "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." Id. "[A] declaratory judgment is not available when the result would be a partial 'end run' around" the Eleventh Amendment's bar on retrospective awards of monetary relief. Id.
 
 
 32
 Notice Relief. In Quern, the Supreme Court affirmed an order requiring state officials "to send a mere explanatory notice to members of the plaintiff class advising them that there are state administrative procedures available by which they may receive a determination of whether they are entitled to past benefits." Quern v. Jordan, 440 U.S. 332, 334 (1979). Such notice was permissible under the Eleventh Amendment, however, only because it was "ancillary to the prospective relief already ordered by the court." Id. at 349. As the Green Court explained, Quern "notice relief" is simply unavailable when there is no continuing violation of federal law to enjoin. See Green, 474 U.S. at 71.
 
 
 33
 Here, there is no prospective relief to which the notice can be ancillary. As in Green, we cannot order an injunction or any other form of prospective relief because, with the termination of the AFDC program, Connecticut's policy is now concededly in accord with federal law. The notice requested by the Fitzpatrick subclass is therefore an independent, retrospective form of relief barred by the Eleventh Amendment. "Because 'notice relief' is not the type of remedy designed to prevent ongoing violations of federal law, the Eleventh Amendment limitation on the Art. III power of federal courts prevents them from ordering it as an independent form of relief." Id.
 
 II
 
 34
 The district court relied on PRWORA's Savings Clause to create a prospective obligation that could be declared and become the subject of notice relief. See Ward, 9 F. Supp. 2d at 116-19. The Savings Clause does not change our analysis. That clause provides:
 
 
 35
 (2) CLAIMS, ACTIONS, AND PROCEEDINGS.-The amendments made by this title shall not apply with respect to
 
 
 36
 (A) powers, duties, functions, rights, claims, penalties, or obligations applicable to aid, assistance, or services provided before the effective date of this title under the provisions amended; and
 
 
 37
 (B) administrative actions and proceedings commenced before such date, or authorized before such date to be commenced, under such provisions.
 
 
 38
 116(b)(2), 110 Stat. at 2184 (emphasis added). The district court found that this clause saves the present claim insofar as it allows the subclass to assert a "right" or "claim" to "aid, assistance, or services provided before the effective date" of PRWORA that is premised on some continuing obligation of the State. See Ward, 9 F. Supp. 2d at 116. The district court located that continuing obligation in 42 U.S.C. 602(a)(22), a former AFDC statute, which obligates the Commissioner to correct any underpayment of benefits:
 
 
 39
 A State plan for aid and services to needy families with children must-...
 
 
 40
 (22) provide that the State agency will promptly take all necessary steps to correct any overpayment or underpayment of aid under the State Plan....
 
 
 41
 42 U.S.C. 602(a)(22) (1994).
 
 
 42
 We have previously interpreted 602(a)(22) expansively to require the correction of AFDC underpayments:
 
 
 43
 Looking first at the language of the statute, we find that the language of [ 602(a)(22)], referring to "all necessary steps" and "any ... underpayment," is completely unrestrictive and unlimited.... As stated recently by the Ninth Circuit in a case involving claims very similar to those in the instant case,"'All' means every. 'Any' means without restriction or limitation. The plain meaning of the statute could not be broader. Congress intended all underpayments to be corrected."
 
 
 44
 Tambe v. Bowen, 839 F.2d 108, 110 (2d Cir. 1988) (quoting Edwards v. McMahon, 834 F.2d 796, 799 (9th Cir. 1987)) (emphasis in original) (additional citations omitted). But Tambe does not bear upon the Eleventh Amendment, which was not at issue in that case. Nothing in Tambe indicates that Congress intended 602(a)(22) to abrogate the states' Eleventh Amendment immunity.
 
 
 45
 As to the Savings Clause itself (and what it does and does not save) we think the district court may have over-read it. The district court, invoking 116(b)(2)(A), found that the Savings Clause "expressly retains duties and obligations incumbent upon a state under the AFDC program which existed prior to the effective date of the amendment, as well as prior claims, such as plaintiffs' underpayment claims." Ward, 9 F. Supp. 2d at 119 (emphasis in original). This finding depends absolutely on a key phrase from subsection (A) of the Savings Clause--which saves claims for "aid, assistance, or services provided before the effective date of this title"--and the reading of that phrase to encompass aid that was not provided, or was under-provided, prior to the effective date of PRWORA. That is one plausible reading. On the other hand, subsection (A) references benefits "provided" rather than (as it could have) benefits "owed" or "wrongfully withheld" or "required to be provided." In addition, the subsection preserves claims for "aid, assistance, or services provided before the effective date" of PRWORA. 116(b)(2)(A), 110 Stat. at 2184 (emphasis added). The subsection certainly does not describe aid to be provided in the future, after the effective date of PRWORA. Accordingly, the scope of subsection (A) of the Savings Clause is at best ambiguous.
 
 
 46
 This ambiguity does not mean that PRWORA forecloses the recovery of AFDC aid that was short-changed or wrongfully denied by the state. Subsection (B) of the Savings Clause expressly saves "administrative actions and proceedings commenced . . . or authorized . . . to be commenced" prior to the effective date. 116(b)(2)(B), 110 Stat. at 2184. Therefore, the subclass could invoke the Savings Clause to recover their underpayments in state administrative proceedings, with (presumably) appeals to state courts.
 
 
 47
 In any event, subsection (A) of the Savings Clause is insufficiently clear for us to find that Congress intended to abrogate the states' Eleventh Amendment immunity. See Kimel v. Florida Bd. of Regents, U.S. 120 S.Ct.631, 640, 145 L.Ed.2d 522 (2000)("Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.") (citations and internal quotation marks omitted). No doubt, the Savings Clause strengthens the argument of the Fitzpatrick subclass that if Connecticut's policy violated federal law prior to the termination of the AFDC program, the subclass is entitled to a recovery in some forum. But the ongoing ability of the subclass to recover for past underpayment does not change the retrospective nature of such relief, and does not compel the conclusion that such a recovery may be had--or the right to it declared and the means to collect it noticed and advertised--in this federal forum.
 
 
 48
 With or without the Savings Clause, the subclass is seeking relief that in every practical sense amounts to an order requiring Connecticut to pay them money on account of entitlement to past benefits. Counsel for the subclass conceded as much at oral argument, acknowledging that the subclass would offer the district court's declaration in state court as res judicata on the question of whether or not Connecticut had violated federal law. The state court would thus be left with only two issues to resolve: (1) whether the reduction in benefits was nevertheless appropriate pursuant to some other federal regulation, and, if not (2) the amount of damages to which each subclass member is entitled. As the Green Court held, this type of relief is precisely what the Eleventh Amendment prohibits federal courts from awarding.
 
 
 49
 Our holding does not affect or impair the ability (if any) of the subclass to recover in state administrative proceedings. We hold only that the relief requested by the subclass in this action is barred by the Eleventh Amendment.
 
 CONCLUSION
 
 50
 For the foregoing reasons, we reverse the judgment of the district court and direct the court to dismiss the claims of the Fitzpatrick subclass because they are barred by the Eleventh Amendment.
 
 
 
 Notes:
 
 
 [1]
 The 1995 amendment changed Connecticut General Statute 17b-104 to provide:
 Effective July 1, 1995, for a family living in subsidized housing, eight per cent of the standard of need, which represents the value of the subsidized housing, shall be counted as income in determining the benefit payment. Effective January 1, 1996, for families subject to time limited benefits pursuant to subsection (b) of section 17b-112 and living in subsidized housing, the benefit payment shall be reduced by eight per cent of the payment standard.
 1995 Conn. Acts 95-351, 2(d) (Reg. Sess.) (codified at Conn. Gen. Stat. 17b-104 (1996)).
 Recognizing that some families received housing subsidies that were less than eight percent of the standard of need, the Commissioner promulgated a revised policy that reduced AFDC benefits by the lower of (i) eight percent of the standard of need, or (ii) the actual amount of the housing subsidy. See Ward, 895 F. Supp. at 410 (discussing DSS Policy Transmittal, No. UP-95-17).
 
 
 [2]
 This notice, commonly referred to as Quern notice relief, described the subclass, the nature of the law suit, and presented four questions for the recipient to answer to determine whether the District Court's decision applied to the recipient. The notice then went on to state:
 This federal lawsuit has now ended, and no further relief is available from the federal court. If your answer to all four questions above was YES, you should promptly contact the Department of Social Services to request a procedure for determining whether the child you cared for is entitled to some reimbursement of his or her AFDC benefits. You may file the attached form with your local office of the Department of Social Services to apply for reimbursement. Any such reimbursement or procedures may only be reviewed thereafter by whatever state administrative or judicial procedures which may be available for that purpose.
 
 
 
 51
 STRAUB, Circuit Judge, dissenting from the majority opinion:
 
 
 52
 I respectfully dissent. In my view, the Eleventh Amendment poses no bar to this lawsuit.
 
 
 53
 The critical inquiry in this case is whether the Fitzpatrick subclass[1] children have alleged a continuing violation of federal law by the Commissioner so that they are entitled to prospective relief as contemplated by Ex parte Young, 209 U.S. 123 (1908). Characterization of the subclass's claim as one for retroactive money damages-as the majority does-has some superficial appeal; the subclass is, after all, seeking correction of allegedly illegal past underpayments arising under a terminated government program, which, at some point, could require money to flow from the state treasury. Nevertheless, because of the interaction of the PRWORA's Savings Clause and former AFDC statute 42 U.S.C. 602(a)(22) (1994), I would look beyond the surface of this argument and hold that the Eleventh Amendment does not prevent this suit in federal court. In addition, I agree with the District Court's conclusions on the merits, and would therefore affirm.
 
 I. The Eleventh Amendment Bar
 A. Operation of PRWORA's Savings Clause
 
 54
 The Saving Clause contained in the PRWORA transition rules provides:
 
 
 55
 (2) CLAIMS, ACTIONS, AND PROCEEDINGS.- The amendments made by this title shall not apply with respect to
 
 
 56
 (A) powers, duties, functions, rights, claims, penalties, or obligations applicable to aid, assistance, or services provided before the effective date of this title under the provisions amended; and
 
 
 57
 (B) administrative actions and proceedings commenced before such date, or authorized before such date to be commenced, under such provisions.
 
 
 58
 116(b)(2), 110 Stat. at 2184. On its face, the Savings Clause plainly states that the PRWORA is not applicable to, inter alia, claims, obligations, and proceedings either arising or begun prior to the effective date of the amendments and, therefore, the laws and regulations of the terminated AFDC program would still govern such claims, obligations, and proceedings.
 
 
 59
 Common sense supports this interpretation: If the requirements of the TANF program do not apply to pre-PRWORA claims, obligation and proceedings, as 116(b)(2) clearly states, and if the requirements of the former AFDC program do not apply either, then these claims, obligations, and proceedings would cease to exist with the effective date of the PRWORA. There is no indication, however, that Congress intended simply to allow pre-PRWORA AFDC claims, obligations, and proceedings to fade into limbo. On the contrary, one of the reasons for providing transition rules in legislative amendments is to prevent existing rights from being extinguished unintentionally, and the Savings Clause is the means by which Congress bridged the transition between the AFDC and the TANF programs.
 
 
 60
 Furthermore, this broad reading of the Savings Clause is supported by the view of the agency responsible for administering the TANF program. The United States Department of Health and Human Services, in announcing the repeal of several of its regulations due to passage of PRWORA, has advised:
 
 
 61
 Effect of Rulemaking on Prior or Pending Actions
 
 
 62
 You should be aware that the regulations we are removing still would apply with respect to State actions and behavior that occurred before the effective date of the new legislation. Under the transition rules of PRWORA (see 116(b)(2)-(3) of the Act), the provisions of the new law do not apply "with respect to ... duties, functions, rights, claims, penalties, or obligations
 
 
 63
 applicable to aid, assistance, or services provided before" such effective date. They also do not apply to "administrative actions and proceedings" authorized to commence before that date.
 
 
 64
 Thus, the regulatory provisions that we are removing will continue to apply to State actions that took place prior to the implementation of the new programs, and we would base any penalty, disallowance, or claims against the State on such regulations.
 
 
 65
 Rules and Regulations, Department of Health and Human Services: Repeal of Obsolete Title IV-A and IV-F Program Rules, 62 Fed. Reg. 64301, 64302 (Dec. 5, 1997) (announcing removal of obsolete regulations due to PRWORA). Although there is no need to rely on this pronouncement because the statute is not ambiguous, see Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), it is entirely consistent with, and therefore confirms, my reading of the Savings Clause. Moreover, if the statute is ambiguous-as the majority suggests-the Department's interpretation must be honored if it is a "permissible construction of the statute." Id. at 843.
 
 
 66
 Thus, given the plain language of the Savings Clause, the analysis now necessarily focuses on whether, under the laws and regulations of the AFDC program-specifically, 42 U.S.C. 602(a)(22)-the subclass's action is amenable to declaratory and injunctive relief.[2]
 
 B. Section 602(a)(22) of the AFDC Program
 
 67
 Title 42, Section 602(a) of the United States Code provides, inter alia, that:
 
 
 68
 A State plan for aid and services to needy families with children must-...
 
 
 69
 (22) provide that the State agency will promptly take all necessary steps to correct any overpayment or underpayment of aid under the State Plan....
 
 
 70
 42 U.S.C. 602(a)(22) (1994). We have previously interpreted 602(a)(22) expansively to require the correction of AFDC underpayments:
 
 
 71
 Looking first at the language of the statute, we find that the language of [ 602(a)(22)], referring to "all necessary steps" and "any ... underpayment" is completely unrestrictive and unlimited.... As stated recently by the Ninth Circuit in a case involving claims very similar to those in the instant case, "'All' means every. 'Any' means without restriction or limitation. The plain meaning of the statute could not be broader. Congress intended all underpayments to be corrected."
 
 
 72
 Tambe v. Bowen, 839 F.2d 108, 110 (2d Cir. 1988) (quoting Edwards v. McMahon, 834 F.2d 796, 799 (9th Cir. 1987)) (additional citations omitted).
 
 
 73
 Applying this interpretation, we affirmed in Tambe a district court's grant of summary judgment to a class of plaintiffs requiring the state to make corrective payments to the class members. See 839 F.2d at 111. Although we found it unnecessary to address the Eleventh Amendment,[3] the result establishes that injunctive relief to correct AFDC underpayments is appropriate under 602(a)(22). See also Zeien v. Palmer, 955 F.2d 506, 508, 512-13 (8th Cir. 1992) (affirming district court order compelling payment under 602(a)(22) to correct prior improper reduction in benefits based on inaccurately anticipated child support payments).
 
 
 74
 Thus, taking Tambe's treatment of 602(a)(22) to its next logical step, it necessarily follows that pursuant to that statute, the Commissioner has a continuing legal obligation to correct underpayments of AFDC benefits. To the extent that the Commissioner fails to do so, she is in present violation of federal law and subject to injunctive and declaratory relief. Accordingly, I would hold that the Eleventh Amendment does not preclude the District Court from issuing an injunction to compel prospective compliance with federal law in the circumstances present here.
 
 
 75
 For this reason, reliance on Green v. Mansour, 474 U.S. 64 (1985), is misplaced. In Green, AFDC recipients challenged certain policies of the state of Michigan that, during the pendency of the action, because of amendment to the federal and state requirements, became compliant. See 474 U.S. at 66. The Supreme Court held that the Eleventh Amendment barred the further pursuit of the action "[b]ecause there [was] no continuing violation of federal law to enjoin in this case." 474 U.S. at 71 (emphasis added). Hence, despite some factual similarities, Green is distinct: Unlike in Green, the violative conduct at issue here is on-going because 602(a)(22) renders it so, and the relief at issue is prospective in nature.
 
 
 76
 In addition, had the District Court simply and directly ordered the Commissioner to pay an amount of money to the appellees, this relief would, of course, be prohibited by the Eleventh Amendment as an impermissible award of damages. See Edelman v. Jordan, 415 U.S. 651, 664-68 (1974). In Edelman, the Supreme Court reversed an order compelling the state of Illinois to pay money in the form of "equitable restitution" to a class of plaintiffs in compensation for past underpayments of disability benefits. See id. at 664-68. The Supreme Court reasoned that, whatever the name, "this retroactive award of monetary relief ... is in practical effect indistinguishable in many aspects from an award of damages against the State.... It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant State officials." See id. at 668.
 
 
 77
 The situation presented in Edelman, however, is not the situation before us because the District Court declared that the Commissioner was violating federal law and directed that notice be sent to the Fitzpatrick subclass. This relief does not order the payment of money from Connecticut to the appellees. Nor does it even "trigger the state administrative machinery" that can provide such relief. Quern, 440 U.S. at 348. Rather,
 
 
 78
 [w]hether a recipient of notice decides to take advantage of those available state procedures is left completely to the discretion of that particular class member; the federal court plays no role in that decision. And whether or not the class member will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court.
 
 
 79
 Id. (emphasis added).
 
 
 80
 Moreover, the possibility-indeed, even the "inexorab[ility]"-that compliance with 602(a)(22) may ultimately lead to the payment of state funds does not transmute the relief at issue into an impermissible award of damages. See id. at 347; but see Reed v. Health and Human Servs., 774 F.2d 1270, 1275-76 (4th Cir. 1985) (holding that correction of past underpayments pursuant to 602(a)(22) can "only constitute redress of past violations of federal law" barred by the Eleventh Amendment), rev'd on other grounds, 481 U.S. 368 (1987). Not every remedy having an impact on the state fisc is considered an award of damages prohibited by the Eleventh Amendment: "[A] federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." Quern, 440 U.S. at 337. Thus, in Graham v. Richardson, 403 U.S. 365 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying benefits to otherwise-qualified recipients who were aliens despite the added costs to the states. See id. at 376-80. Likewise, in Goldberg v. Kelly, 397 U.S. 254 (1970), New York City welfare officials were enjoined from following state policy which authorized the termination of AFDC and state welfare benefits without a prior evidentiary hearing despite the resulting drain on the state's financial and administrative resources. See id. at 264-66. And most significantly, in Milliken v. Bradley, 433 U.S. 267 (1977), the Supreme Court upheld a school desegregation decree requiring Texas to pay half of the costs associated with remedial educational programs that were "'compensatory' in nature" and intended to benefit children who had been subjected to past segregation. See id. at 288-90.
 
 
 81
 Whether relief requires the expenditure of state funds is not always determinative in the Eleventh Amendment inquiry. Rather, repercussions on a state's treasury resulting from compliance with decrees prospective in nature are merely ancillary effects that "[are] a permissible and often an inevitable consequence of the principle announced in Ex parte Young." Edelman, 415 U.S. at 668. While prospective compliance with 602(a)(22), to a certain extent, bears an intuitive similarity to an award of damages, "the difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between day and night." Edelman, 415 U.S. at 667. Accordingly, in light of the fact that the obligation to comply with 602(a)(22) is on-going, and that the relief at issue here does not actually order the transfer of money between the parties, I would hold that the Fitzpatrick subclass's action is permitted under Ex parte Young.
 
 
 82
 I further respectfully suggest that the majority's additional arguments on this point miss the crux of the District Court's decision. The majority construes the District Court's decision as based on the conclusion that the Savings Clause itself somehow sets forth the "continuing" violation for which relief is ordered. However, the point is not that the Savings Clause itself sets forth the continuing obligation to correct underpayments but, rather, that it makes operative otherwise-inapplicable statutes and regulations that do provide such an ongoing obligation. In other words, it is 602(a)(22) under the AFDC program-made operative through PRWORA's Savings Clause-and not the Savings Clause itself, that defines the continuing violation.
 
 
 83
 In addition, I believe that the majority misconstrues the decision below as somehow based on the abrogation of state sovereign immunity by the Savings Clause. However, the abrogation of sovereign immunity removes such immunity where it otherwise exists, while Ex parte Young defines the boundaries of sovereign immunity, excepting claims from the Eleventh Amendment's prohibition. See Green, 474 U.S. at 68 (explaining that Ex parte Young "created an exception" to state sovereign immunity); see also Alden v. Maine, 527 U.S. 706, 119 S. Ct. 2240, 2263 (1999) (noting that Ex parte Young recognized "the exception to our sovereign immunity doctrine"). Because the decision below was based on the conclusion that the Fitzpatrick subclass's action falls within the ambit of Ex parte Young-that the Commissioner's failure to correct past underpayments constitutes an on-going violation of applicable federal law-whether the Savings Clause is sufficient to abrogate a state's Eleventh Amendment immunity is not relevant.
 
 
 84
 In sum, because the Savings Clause renders 602(a)(22) applicable to the subclass's action, the Commissioner has a continuing and presently existing obligation to correct any AFDC underpayments arising prior to the effective date of PRWORA. To the extent that the Commissioner fails to correct any such underpayments, she is in present violation of federal law, namely 42 U.S.C. 602(a)(22) of the former AFDC program, made applicable via PRWORA's Savings Clause. Accordingly, injunctive and declaratory relief may issue requiring the Commissioner to comply with her obligations under 602(a)(22). And, ancillary to this relief, notice may issue to the Fitzpatrick subclass informing them of the status of their action and the remedies available to them, pursuant to Quern v. Jordan, 440 U.S. 332 (1979). See Green, 474 U.S. at 71 ("a request for a limited notice order will escape the Eleventh Amendment bar if the notice is ancillary to the grant of some other appropriate relief that can be 'noticed.'"). For all of these reasons, I would hold that the Fitzpatrick subclass's action falls within the ambit of Ex parte Young and the Eleventh Amendment does not bar its pursuit.
 
 
 85
 II. The Propriety of the Housing Subsidy Offset
 
 
 86
 Since in my view, the Eleventh Amendment does not bar the Fitzpatrick subclass's action, I would address the merits of the action and would conclude that the decision of the District Court should be affirmed. The Commissioner argues that the policy of treating housing subsidies received by the subclass children's caretakers as the income of the children themselves, and reducing the children's AFDC benefits as a result, is explicitly allowed by the AFDC statute, 42 U.S.C. 602(a)(7)(C). Alternatively, the Commissioner contends that even if this statute is not applicable, the housing subsidies received by the subclass children's caretakers can be attributed to the children because the subsidies are still "available" to them, as defined by AFDC regulation 45 C.F.R. 233.20(a)(3)(ii)(D). I find neither argument persuasive.
 
 A. Section 603(a)(7)(C) of the AFDC Program
 
 87
 Title 42, Section 602(a) of the United States Code provides that:
 
 
 88
 A State plan for aid and services to needy families with children must-...
 
 
 89
 (7) ... provide that the State agency-...
 
 
 90
 (C) may, in the case of a family claiming or receiving aid under this part for any month, take into consideration as income (to the extent the State determines appropriate, as specified in such plan, and notwithstanding any other provision of law)-...
 
 
 91
 (ii) an amount not to exceed the value of any rent or housing subsidy provided to such family, to the extent such value duplicates the amount for housing included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income.
 
 
 92
 42 U.S.C. 602(a)(7)(C)(ii) (1994).
 
 
 93
 The text of the statute is clear: a state may reduce the AFDC benefits of a recipient who also receives a housing subsidy to the extent the housing subsidy duplicates an amount for housing already included in the maximum amount that would be payable under the State AFDC plan. The District Court, however, rejected the applicability of 602(a)(7)(C)(ii) to the subclass, concluding that:
 
 
 94
 section 602(a)(7)(C) applies to consideration of the income of families claiming or receiving AFDC, and addresses the value of housing subsidies provided to those families, [while] the plaintiff subclass consists not of families receiving AFDC, but of individual children receiving AFDC who live with non-legally liable caretakers who are not part of the children's assistance unit.
 
 
 95
 See Ward, 9 F. Supp. 2d at 113.
 
 
 96
 I agree with the District Court's conclusion that 602(a)(7)(C)(ii) is inapplicable to the Fitzpatrick subclass. As the Commissioner acknowledges, "family" is a "term of art that was used in 602(a)(7)(C), and, indeed, throughout the [Social Security] Act, to refer to the family filing unit that consisted of the 'child or relative claiming aid.'" See Appellant's Brief at 39. Thus, an individual child like Fitzpatrick can constitute a "family of one" under the AFDC program. See, e.g., Martinez v. Maher, 631 F.2d 5, 5 (2d Cir. 1980). From these principles, however, the Commissioner then argues that "the [District] Court's finding that the text of 602(a)(7)(C) is not controlling because a dependent child is not a 'family' for purposes of 602(a)(7)(C) is legally erroneous." Appellant's Brief at 41. I disagree.
 
 
 97
 Section 602(a)(7)(C)(ii)'s applicability is dependent on whether the relevant AFDC "family"-i.e., the "filing unit" or "assistance unit"-also receives a housing subsidy. In this case, as the Commissioner recognizes, the AFDC family consists solely of children who are in the care of non-legally responsible relative caretakers. The housing subsidies used to offset the AFDC benefits, thus, are not received by the AFDC family-i.e., the children in the Fitzpatrick subclass-but, rather, by the subclass children's caretakers, who are not AFDC recipients. Viewed from another perspective, the proper focus of the inquiry is not whether the AFDC beneficiaries are part of a family, defined in the vernacular, that lives together in subsidized housing, but rather, whether the AFDC family-i.e., the AFDC filing unit or assistance unit-includes someone who is receiving a housing subsidy. Here, each subclass child constitutes an AFDC family unto himself or herself (or, in some cases, constitutes an AFDC family with their minor siblings). The non-legally responsible relative caretaker is not part of this AFDC family. Thus, by definition of the subclass, no member of an AFDC family in the subclass receives housing subsidies and, therefore, 602(a)(7)(C)(ii) is inapplicable.
 
 
 98
 To support the contention that 602(a)(7)(C)(ii) is applicable, the Commissioner refers us to the usage of the word "family" under both the federal "Section 8" program, see, e.g., 42 U.S.C. 1437; 24 C.F.R. 982.1, 982.201(c), and Connecticut's Rental Assistance Program ("RAP"), see, e.g., Conn. Gen. Stat. 17b-812(a); Reg. Ct. Ag. (Social Services) 17b-812-1 (1996). The Commissioner contends that these programs define family as "including all relatives who live together in the household," see Appellant's Brief at 41, and argues that this broader definition should control here. Quite plainly, however, the word "family" possesses different meanings under the AFDC and under the housing subsidy programs. Given that the issue here is whether a "family" defined under the AFDC program is receiving housing subsidies, the definition of family under the housing programs is irrelevant. The AFDC families in this case, namely, the Fitzpatrick subclass children, simply do not receive housing subsidies, even if they happen to share a home with someone who does. The Commissioner's selective grafting of definitions would contort 602(a)(7)(C)(ii) beyond its intended form. The statute is, by its own terms, inapplicable.
 
 
 99
 B. 45 C.F.R. 233.20(a)(3)(ii)(D) of the AFDC Program
 
 
 100
 Alternatively, Connecticut's offset policy can stand if the housing subsidies received by the caretakers were otherwise "available" to the class members as defined by AFDC regulation 45 C.F.R. 233.20(a)(3)(ii)(D) (1995). On this point, the Commissioner contends that the caretakers' housing subsidies were available to the class members because the subsidies were paid "on behalf" of the class members, Appellant's Brief at 43-44, and that the Fitzpatrick subclass somehow "had the legal right to have the subsidy applied toward ... meeting the housing needs of the entire household, including towards [the children's own] housing needs," Appellant's Brief at 46-47. The Commissioner also contends that the housing subsidies were available to the class members because the funds were paid "on behalf of households that included the" subclass children. Appellant's Brief at 47.
 
 
 101
 I am unpersuaded by this availability argument as well. Section 233.20(a)(3)(ii)(D) provides, in relevant part, that:
 
 
 102
 To the extent not inconsistent with any other provision of this chapter, income and resources are considered available both when actually available and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available for support and maintenance.
 
 
 103
 45 C.F.R. 233.20(a)(3)(ii)(D) (1995).
 
 
 104
 The housing subsidies received by the caretakers of the Fitzpatrick subclass children do not meet the definition of "available" under this regulation. The caretakers who received the housing subsidies are, by definition, not legally obligated to care for the subclass children. Thus, it can hardly be said that the children have an enforceable legal right to any portion of the housing subsidies. In addition, there is no liquidated sum present here; housing subsidies fluctuate in both amount and entitlement. Moreover, AFDC regulation 45 C.F.R. 233.20(a)(2)(viii) explicitly prohibits assuming support from a non-legally responsible individual who happens to be a member of the AFDC recipient's household.[4] Thus, in light of these considerations, it can hardly be said that the various housing subsidies were "actually available" to the class members.
 
 
 105
 The Commissioner's position would incorrectly deem all resources that benefit the subclass children as the children's own income. This logic, however, fails to distinguish between benefits derived incidentally from a third-party from resources to which the recipient directly has a right. Not only does this position fail to meet the definition of "available" set forth in 45 C.F.R. 233.20(a)(3)(ii)(D), it indulges in exactly the assumption that 45 C.F.R. 233.20(a)(2)(viii) prohibits. The availability of third-party income under the AFDC program is not a mere function of serendipity. In this case, for income attribution purposes, the caretakers stand as strangers to the Fitzpatrick subclass children; to conflate their resources with the children's income would be contrary to the explicit purpose of the relevant federal regulations.
 
 
 106
 III. The Failure to Pursue Administrative Remedies in a Timely Manner
 
 
 107
 The Commissioner's last argument is that the Fitzpatrick subclass's action is barred because the subclass children failed to seek redress in a timely manner through state administrative forums prior to bringing their 1983 suit. She contends that our decision in Withey v. Perales, 920 F.2d 156 (2d Cir. 1990), holds that "only recipients who made a timely request for an administrative fair hearing [are] entitled to have past underpayments corrected." Appellant's Brief at 49.
 
 
 108
 The Commissioner's reading of Withey, however, is somewhat over-expansive. In Withey, we held that " 602(a)(22) does not preclude a limitations period on claims of underpayment." 920 F.2d at 157. Thus, although Withey does not preclude the imposition of a statute of limitations, it certainly does not require one.
 
 
 109
 More significantly, as the District Court observed, Withey involved two AFDC recipients' challenge to New York's reduction of their benefits based on the state's factual finding that their income was too high and that one of them had previously received an overpayment. See id. In contrast, rather than challenging the Commissioner's findings as to their specific cases, the subclass here challenges the facial validity of the Commissioner's offset policy under federal law via a 1983 action. Thus, it is the three-year statute of limitations for a 1983 action, and not the limitations period for a Connecticut administrative proceeding, that applies. Since the Fitzpatrick subclass filed its action within the required time period, the action is not barred.
 
 
 110
 Moreover, the Fitzpatrick subclass's failure to pursue the administrative process before filing the present action also does not bar the action. The Supreme Court has held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to 1983." Patsy v. Board of Regents, 457 U.S. 496, 516 (1982). "[E]xhaustion is necessary prior to bringing a 1983 action only where Congress has carved out a specific exception to the general rule that exhaustion is not required." Doe v. Pfrommer, 148 F.3d 73, 78 (2d Cir. 1998) (citing Patsy, 457 U.S. at 512). In this case, although there is a Department of Health and Human Services regulation requiring states participating in the AFDC program to provide for administrative hearings when requested by recipients, see 45 C.F.R. 205.10, the Commissioner fails to point out any indication of congressional intent to require the exhaustion of such remedies prior to bringing a 1983 action.
 
 
 111
 For all of the foregoing reasons, I respectfully dissent and would affirm the decision of the District Court.
 
 
 
 Notes:
 
 
 [1]
 Unless otherwise noted, I adopt the various abbreviations and acronyms utilized by the majority.
 
 
 [2]
 The Commissioner does not challenge that she is obligated to comply with the Savings Clause as a condition of participating in the TANF program. Indeed, like the AFDC program, participation in the TANF program requires that states meet certain eligibility requirements and submit a plan for the approval of the Secretary of the Department of Health and Human Services. See 42 U.S.C. 602(a)-(c) (Supp. III 1997).
 
 
 [3]
 Although we did not address the Eleventh Amendment issue, the district court did. The district court concluded that the Eleventh Amendment did not bar its order compelling payments to correct past underpayments because the order did not require the state defendant to pay money damages to the class, but rather, required the state defendant to order the county defendant to make the payments. See Tambe v. Bowen, 662 F. Supp. 939, 942 (W.D.N.Y. 1987). The district court determined that since the county defendant did not claim to be an arm of the state, it could not invoke the protection of the Eleventh Amendment. See id.
 
 
 [4]
 45 C.F.R. 233.20(a)(2)(viii) (1995) provides that "the money amount of any need item included in the standard will not be prorated or otherwise reduced solely because of the presence in the household of a non-legally responsible individual; and the agency will not assume any contribution from such individual for the support of the assistance unit except as provided in paragraphs (a)(3)(xiv) and (a)(5) of this section and 233.51 of this part."